# CIRCUIT COURT OF SOUTH DAKOTA
# SECOND JUDICIAL CIRCUIT

425 N. Dakota Avenue
Sioux Falls, South Dakota 57104
Telephone (605) 367-5920
Fax Number (605) 367-5979
E-Mail Address: joseph.neiles@ujs.state.sd.us

JUDGE JOSEPH NEILES

April 21, 2003

D. Sonny Walter
2900 E. 26th St., #309
Sioux Falls, SD 57103

Thomas R. Hensley
Deputy States Attorney
415 N. Dakota Ave.
Sioux Falls, SD 57104

    Re: State v. Nicholas S. Mears, Cr. 03-287

Dear Counsel:

    The defendant is charged with Attempted Arson in the First Degree. Through his attorney, he has submitted a motion to suppress a statement made to law enforcement, claiming that said statement was not voluntary. A hearing on the motion was held on March 28, 2003, and the court took the defendant under advisement to consider the motion and evidence offered, as well as the arguments of counsel.

## THE FACTS

    The defendant lives in an apartment complex located at 4904 Kirkwood Circle in southwest Sioux Falls. This apartment complex apparently was primarily filled with elderly residents, although the defendant was only 22 years of age. There was some testimony to suggest that the apartment was used as an "assisted living" facility by those with some limitations in their ability to look after themselves, in the nature of a group home.

    Testimony presented at the hearing suggested the defendant had previously been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), and Dr. Steve Langenfeld, a psychologist, testified that the defendant has a strong dependent personality, wants to be accepted by others, looks to others for approval, and won't make waves. He felt the defendant was generally submissive and cooperative, but can become

Exhibit A

disagreeable. He noted that one of the characteristics of ADHD is that they act first and think later, they don't think about the consequences of their actions at the time they act. He testified the defendant's I.Q. appeared to be in the low normal range. He was diagnosed with dysthymia, a mild to moderate chronic form of depression. Exhibit C, the defendant's report card from Lincoln High School, indicated he received mostly C's and D's, with a few B's and F's. He was ranked 312 in his class of 312, last in his class. He did not graduate and quit school, apparently in about his junior year.

On January 20, 2003, fire and police officers were dispatched to the defendant's apartment building regarding a fire call, in the very early morning hours, around 1:00 a.m. Apparently, a fire had been started in a shopping cart inside a closet off the common area of the apartment, and also it appeared a separate fire had been started in a planter stand just outside that closet door. The fire did not result in any burning to the building. According to the testimony presented at the hearing, fire and police officials concluded the fire was intentionally set.

Further evidence offered suggested that after the fire alarm sounded, the defendant came to the apartment of a friend in the building, the only other resident of a younger age, and reported that he had seen a fire. The defendant and one of the guests went to where the fire was and put it out with a fire extinguisher. The friend and his guests and the defendant then proceeded to vacate the building.

Officer Shannon Irish of the Sioux Falls Police Department was initially dispatched to the area of the fire for traffic control. Once he was advised that he was no longer needed for that purpose, he went to the apartment building at the request of Officer Redmond, as the fire had been determined to be suspicious. He initially made contact with two elderly residents who told him that the defendant was the person to originally discover the fire, and was in Apartment 103. At Apt. 103 he made contact with several people, including the defendant, for interviews.

The defendant told Officer Irish that he lived in Apartment 204, and that he had noticed the fire in the closet after hearing the fire alarms go off and walking down to the first floor on the stairway. Officer Irish did not consider the defendant a suspect at this time.

Sgt. Severson later showed up, and it was decided to separate the various people for further interviews. The defendant was then interviewed in a patrol car, after being told that it was a serious case and he needed to fill out a statement, at about 1:45 a.m. During this process, the officers discovered some of the residents were reporting items stolen from there apartments during the initial fire alarm. Even after this interview in the car, the defendant was still not a suspect. He had made no admissions.

Det. Sgt. Mundt, a narcotics officer, eventually arrived. The narcotics division of the Police Department is in charge of arson investigations. He was told by Severson that the defendant was the person who had reported the fire, and was acting the most

suspiciously of all of the residents, and probably had set the fire. Sgt. Mundt took the defendant to the police station for further interviews. At the P.S.B., at about 3:36 a.m., Sgt. Mundt read the defendant his Miranda warning and interrogated him about the fire. At first, the defendant denied any involvement in the fire setting, but eventually, after extensive questioning, admitted opening the door and throwing a match into the closet to set the fire.

During the interview, Sgt. Mundt repeatedly lied to the defendant about a claimed videotape of him starting the fire. The defendant repeatedly denied starting the fire or having anything to do with it. Sgt. Mundt told the defendant that he had to "report back to his boss. So I got to say, you know, that Nick is, you know, is this crazy guy that is out there starting fires and trying to hurt people or if there was, he was just trying to get some attention or what..." The defendant continued to deny any involvement in the fire starting. Sgt. Mundt continued to press, and told him "hopefully I'll get the whole truth out of you here in just a little while and make things go a lot easier." At about 3:50 a.m., after fifteen minutes of interrogation without "success, Sgt. Mundt left the room, and left the defendant alone waiting for about another 43 minutes.

Then, at 4:33 a.m., Sgt. Mundt returned to the room, and the defendant asked to use the restroom. After that, they returned to the interrogation room at 4:35, and Sgt. Mundt, this time with Det. Fiegen, again told the defendant they had been viewing the videotapes of him starting the fire. He reminded the defendant that it was one year since his grandmother had died, and suggested that he was under a lot of stress. Again, Sgt. Mundt reminded the defendant he would be reporting to his boss "what kind of person" the defendant was, was he just under a lot of stress or was he trying to kill someone. The defendant continued to deny starting the fire.

Finally, the defendant, at about 4:42 a.m., asked what was going to happen, was he going to get to go home and get some sleep. Sgt. Mundt told him he had not told him what happened, and that if he thought he was lying to him, he would have to continue to hold on to him. The defendant then asked if he confessed, even though he knew he didn't do it, if he would be allowed to go home. Det. Fiegen told him that he should tell the truth "because that's going to help you out more than anything."

The interrogation continued, and the defendant suggested that if he were to start a fire, he would have used a match. Sgt. Mundt told him that he had already admitted starting the fire, and he just wanted to find out why. Again, the defendant stated that he just wanted to know if he was going to get to go home or leave, and Sgt. Mundt promised him he would be allowed to go home, at about 3:52. When the defendant told Sgt. Mundt that he was being stressed by the officers questioning, Sgt. Mundt then told him he would feel better if he told them what happened.

Finally, the defendant then claimed he used a match, and just opened the closet door and threw it in there. However, he denied starting any fire in the potted tree outside the door to the closet. After further vague statements, the defendant again inquired about

his desire to go home. More questioning occurred, wherein the officers were trying to find out what was started on fire, and again, at about 5:05 the defendant again asked if he told them he started it with a piece of paper could he leave and go home. At 5:07 the defendant told them he was just telling them that the truth was that he started the fire was just to get out of the police station and go home.

The officers continued to try to find out why the defendant would have started the fire, and suggested several reasons, including the stress in his life. The defendant talked about a previous job as an electrician's apprentice, and how the travel with that job was overwhelming, and Sgt. Mundt told him that he used to work with DEA in Colorado and had to travel all over, and how stressful that was, and that he had hit his wife because of the stress (he testified that this was a lie he told to appear to be sympathetic with the defendant) and the defendant continued to talk about the stress in his life, and good relationship he had with his mother. The officers asked him to right down a statement admitting starting the fire, because of the stress in his life, and the defendant wanted to go home and see his mom, but thought he could right a statement later.

The officers again left the defendant alone in the interview room, this time for about four minutes, and then came back and further conversations occurred. The officers told the defendant he was going to be "lodged" and would not be allowed to go home. He was allowed to try to call his mother, without reaching her, and after further conversation the defendant told them he only admitted setting the fire to be allowed to go home. The interview finally ended at about 5:44 a.m.

Other facts are noted below where relevant.

## LAW, ANALYSIS AND DECISION

The question concerning the voluntariness of a statement of a defendant, given in response to police questioning, and whether it can be used against him in court, has been the subject of countless court decisions. One of the earliest to deal with police misconduct was Brown v. Mississippi, 297 U.S. 278 (1936), the landmark case on this subject. In that case, a citizen of Mississippi was found murdered. A deputy sheriff went to the defendant's residence, and took him to the residence of the deceased, where a group of white men began to accuse him and others of the crime. When he denied the crime, the men, with the help of the deputy, seized the defendant and hung him by a rope from a nearby tree, let him down, and hung him again. When he was let down the second time, and still protested his innocence, he was tied to a tree and whipped. He still denied any crime, and was released. However, a day or two later the same deputy and another arrested the defendant and took him towards the jail, but on the way crossed the state line to Alabama, and whipped the defendant again, telling him he would be whipped until he confessed, and the defendant agreed to confess as the deputy dictated, and after which he was then taken to jail. The Supreme Court found the statement of that and other defendants to be involuntary, because of the police coercion.

More recent decisions by the Supreme Court have expanded and explained the considerations to be made in determining voluntariness. In Lego v. Twomey, 404 U.S. 477 (1972), the Court held the prosecution must prove by at least the preponderance of the evidence that the confession was voluntary. In Colorado v. Connelly, 479 U.S. 157 (1986), the Court held that coercive police activity is a necessary predicate to a finding that a police confession is not "voluntary" within the meaning of the due process clause, and reaffirmed the preponderance standard of Twomey. In Miller v. Fenton, 474 U.S. 104 (1985), the Court held that the question of the voluntariness of the confession is not a question of fact, but rather a legal question.

In the recent case of State v. Tuttle, 2002 SD 94, 650 N.W.2d 20 (S.Ct. 2002), one of the most recent pronouncements by the South Dakota Supreme Court on this subject, the Court was faced with a case where a defendant freely decided to speak with police officers, but maintained his innocence. During the course of the interview, one of the many statements made by the officer to the defendant included what the Court viewed as a threat, that if the defendant did not "cooperate", the detective would write up his report indicating he was a real jerk about it.

The Court, in its analysis, noted that once suspects are in custody and have been advised of Miranda and agreed to waive their rights under that case, they may be freely questioned as long as interrogators do not obtain a confession through coercion. The factual inquiry centers on (1) the conduct of law enforcement in creating pressure and (2) the suspect's capacity to resist that pressure. (citing Mincey v. Arizona 437 US 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)). "On the latter factor, we examine such concerns as the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, "deception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect." The Court went on to note: "A confession is 'obtained' involuntarily if police overreaching is the actual moving cause for the confession." citing Hutto v. Ross, 429 U.S. 28, 97 S.Ct. 202, 50 L.ED.2d 194 (1976).

The Tuttle decision was handed down by our Supreme Court on July 31, 2002. Apparently, although it involved actions and conduct of the Sioux Falls Police Department, they did not read it, for it is clear that the facts of this particular case, much, much more so than in Tuttle, demonstrate the type of police conduct that this line of cases forbid.

First, as is noted above, on the second prong of the factual inquiry, it is clear that almost every factor weighs heavily against the police. The defendant, while described to have an intelligence quotient in the low normal range, clearly has serious and obvious disabilities with his abilities to comprehend the import of this police questioning. He

admitted to police that he had dropped out of school. He suffers from ADHD, but had been off his medication for some months, which he told the police about. Dr. Langenfeld testified he had a dependent personality, and wanted to please those around him. He wanted to be accepted, looked to others for approval, and would not want to make waves. He described him as generally submissive and cooperative, although he could become disagreeable. He suffered from depression. Defense counsel suggested that as the interview went on, his speech became slurred. While it is not obvious, it is noticeable on a few words the defendant did have some difficulty enunciating all the syllables.

Apparently the defendant had some limited experience with the police, but only as a witness to a vehicular homicide case, in giving a statement as a witness. At first, at the scene of the fire, the defendant thought he was making this statement only as a witness.

Under the first factor, the length of the detention was not great, but not minimal either. Of significance, the defendant was left alone for an extended period of time, and of great significance, this interview took place in the middle of the night. The defendant was tired, and told the officers that. He wanted to go home. As the interview wore on over the hours, the defendant came to the point where he finally asked if he confessed, could he go home?

Of course, the police repeatedly lied to the defendant about the existence of a videotape showing him setting the fire. Telling this lie does not invalidate the statement by itself, but clearly, it is a factor that the court can consider in deciding the voluntariness of the statement. Here, it appears that the videotape became the focus of the statement, as the defendant repeatedly demanded to see the tape, and appeared confused as to how any such tape could exist, as he repeatedly maintained his innocence. But eventually, it appears he began to believe it possible the tape portrayed what the officers claimed, despite his lack of recollection of any such conduct. This suggests to the court someone of low intellect, highly suggestible, and wanting to go along with his captors.

Like Tuttle, the police officer here "threatened" the defendant that if he did not cooperate, the detective would have to go to his boss and tell him what kind of person the defendant was, was he a person under a lot of stress seeking attention, or was he trying to kill someone. The defendant was also told that if he did not cooperate and tell them the truth, they would continue to hold him and not let him go home. Clearly, this was a threat. In Tuttle, the officer only said he would write his report saying the defendant was a "jerk" and was not cooperating, a minimal threat at best, hardly one that most would consider a threat at all. Here, the threat was much greater, and more direct. He was told that if he did not cooperate and give a full confession, he would be described as a "killer" to the detective's boss. The implied threat in that statement could not have been much stronger. The defendant was also made promises. He was told that if he cooperated and told the whole truth, things would go easier on him. Then, later in the interrogation, the officer was asked by the defendant, could he go home, and simply put, Det. Sgt. Mundt said "I'll let you go home, but I need to. I'm not going to let you go home without a whole story", immediately after which the defendant noted "Well the tape shows that I

did it" and a moment later, after noting that while he knew in his mind he did not do it, the guys interviewing him were detectives, and they thought he did it, he said that if he started such a fire, it would be with a match. After a very few more questions, where the police wanted to know whether he used something to start the fire, he said "Nothing, I just threw it in there." The threats and promises, along with all the other "totality of the circumstances, led directly to the "confession".

The defendant appeared to believe, perhaps, that his psychological problems that in the past had caused him to have visions, had led him to conduct which he did not recall. He repeatedly told the police he was feeling "stressed" by the police interrogation. That, combined with the lack of sleep, his low normal intelligence, his psychological problems and the promises and threats of the police, led directly to this "confession". This court must determine whether, by a preponderance of the evidence, the confession was voluntary. I conclude beyond all possible doubt that this confession was involuntary. The motion to suppress is granted, and the defendant's counsel is directed to prepare the appropriate findings of fact and conclusions of law and order for the court's signature.

While it did not enter into my decision in this case, I also cannot help but comment on the "confession" itself. The "facts" as described by the defendant are almost laughable if it were not for the seriousness of the case. It is difficult to believe how any fire could have been set in the manner described by the defendant. He said he just opened the door and threw the paper match in, without taking the time to provide fuel or anything else. He was confused by the presence of the picture frame. He denied starting any fire in the tree planter. He seemed to be asking the officers to give him the answers to the questions they were asking, solely to please them so he could go home. It was not a believable statement.

Sincerely,

Joseph Neiles
Circuit Court Judge